919 THIRD AVENUE  NEW YORK  NEW YORK  10022-3908

JENNER&BLOCK LLP

February 15, 2017

Michael W. Ross
Tel +1 212 891 1669
mross@jenner.com

*VIA ECF AND HAND DELIVERY TO CHAMBERS*

Hon. Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *Wang v. United States*, Case No. 90-CR-1019

Dear Chief Judge Irizarry:

I write on behalf of Defendant Joseph Wang in connection with his upcoming resentencing in the above-captioned matter. Joseph Wang is scheduled to be resentenced on May 1, 2017, pursuant to *Miller v. Alabama*, 132 S. Ct. 2455 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). As articulated in *Miller* and *Montgomery*, the Eighth Amendment to the U.S. Constitution requires a sentencing court to conduct an individualized assessment of a juvenile offender that accounts for their "diminished culpability and greater prospects for reform." *Miller*, 132 S. Ct. at 2464. Joseph's case reflects *Miller*'s core holding that juveniles are different. Joseph committed serious crimes as a juvenile offender. When analyzed under *Miller*, it is apparent that the juvenile who committed those crimes is now an adult who is deeply remorseful for his crimes and far more mature than he was when he committed them. His more than 25 years in prison without a disciplinary incident, and his demonstrated commitment to bettering himself and his community—the U.S. Probation Department has called him a "model prisoner"—illustrate the central tenet of *Miller* that juveniles can change.

Given his personal growth and acceptance of responsibility for his crimes, we respectfully request a sentence of 30 years.

I.   **JOSEPH WANG'S EARLY LIFE AND CRIMINAL CONDUCT**

   A.   **Joseph Wang's Early Childhood**

Joseph Wang was born in Taiwan on January 5, 1973. Ex. B (Psychiatric Evaluation of Dr. Richard G. Dudley, Jr.) at 1, 3. He lived there with his parents, older brother, and older sister until 1982, when the rest of his family immigrated to the United States. *Id.* at 3. Joseph, who was only nine at the time, stayed behind and lived in Taiwan with his aunt for the next year—a period during which he was disconnected from his immediate family, and which his sister, Kristy, has

described as placing a significant "mental and emotional toll" on him.  Ex. D (Letter of Yi Fei "Kristy" Wang).

When Joseph arrived in the United States the following year, he did not speak English.  Ex. B at 4.  Although he was placed in an ESL course, neither the teacher nor his classmates spoke Chinese, which hindered his ability to improve his language skills.  *Id*.  These language difficulties prevented Joseph from succeeding in school—where he continued to advance in grade level despite failing most of his classes—and also isolated him socially from his peers.  *Id.*

### B. The Death of Joseph Wang's Mother

Within a year of Joseph's reunification with his family, when he was 10 or 11 years old, Joseph's mother became seriously ill with cancer.  Ex. B at 3–4.  Because Joseph's father was working a significant amount during that time, he was rarely at home, leaving Joseph and his siblings to bear primary responsibility for caring for Mrs. Wang as her health deteriorated.  *Id.* at 4–5.  Joseph recalled taking care of his mother as her condition worsened to a point where he and his siblings had to start physically carrying her around their home.  *Id.* at 5.  Despite the deterioration of his mother's health, Joseph did not realize that his mother was dying, and no one in his family explained to him what was happening or talked to him about his feelings.  *Id.*

Joseph's mother passed away when he was twelve years old.  Ex. D.  That loss was devastating to Joseph:  Joseph's mother was "the glue" that held the family together, and he described her as the person in the family with whom he had the closest relationship.  Ex. B at 3.  Joseph described the day of her death as "the day that his world crumbled," which precipitated a time period in which everything became a "blur" to him.  *Id.* at 5.

The rest of Joseph's family also struggled with Mrs. Wang's death.  Joseph's siblings described this period of time as one of "tremendous stress" and "anger and sadness."  Ex. D; Ex. E (Letter of William Wang).  As his sister described it, the family felt "like our home was gone forever."  Ex. D.  In part because of their grief, the rest of Joseph's family was unable to provide him with the emotional support he needed during this difficult time.  No one in Joseph's family talked about Mrs. Wang's death after she passed away.  Ex. B at 5.

Lacking support at home, Joseph began to withdraw from his family.  Joseph was so unhappy that a teacher referred him to a psychologist.  But at that time, Joseph was reticent to share his feelings and anxieties with the psychologist, and he only saw her "for a short while."  *Id.* at 4.  Many years later, while serving his prison sentence, Joseph began to understand that he had been suffering from depression and anxiety during the years of his mother's illness and death.  *Id.* at 5.

### C. Joseph Wang's Recruitment Into the Green Dragons and His Crimes

It was in this context that Joseph became involved with the Green Dragons, an Asian youth gang that operated in the Elmhurst and Flushing neighborhoods of Queens. *See United States v. Wong,* 40 F.3d 1347, 1355 (2d Cir. 1994). While still suffering from depression after his mother's death, Joseph started skipping school and began to meet and spend time with other Chinese youth. Participating in activities with other immigrants made Joseph feel better, happier, and more connected, and helped to block out the pain of his mother's death. Ex. B at 6. Over time, Joseph attended school less and less, and by the end of 1987—when he was 14 years old—Joseph had stopped going to school entirely. *Id.*

When he first became associated with them, Joseph did not understand that his friends were members of the Green Dragons. He was impressed by the fact that some of his older friends had cars and that they had "a place" where they could all congregate and spend time. Ex. B at 6. He initially did not appreciate that they were involved in criminal activity. *Id.* Joseph knew that these recent immigrants had more money, clothes, and cars than he did, and that they shared what they had with him. *Id.* He viewed his new community as a "brotherhood," and he felt a sense of belonging. *Id.* Joseph later came to understand that his friends were in a gang, but he did not immediately appreciate what that meant or what his friends were actually doing. *Id.*

By the summer of 1988, Joseph began to notice guns around the places where he and his friends spent time, and he started to learn more about the Green Dragons and their rival gangs. *Id.* at 7. Joseph himself became a member of the Green Dragons that year, when he was 15. *See Wong,* 40 F.3d at 1374.

As Joseph became more involved with the Green Dragons, he started committing crimes. The Green Dragons leaders tried to convince Joseph that his criminal conduct would be a way for him to "prove" himself to them. Ex. B at 7. On July 15, 1989, when Joseph was 16, the Green Dragons instructed Joseph and another member, Alex Wong, to kill a restaurant manager at the Tien Chiau restaurant. *Id.*; *Wong,* 40 F.3d at 1357–58. The two went to the restaurant the next day and killed two individuals, Mon Hsiung Ting and Anthony Gallivan. *Wong,* 40 F.3d at 1357–58. After the murders, Joseph felt completely numb, and did not know how to process what he had done. Ex. B at 7.

On January 23, 1990, Joseph went with other members of the Green Dragons to rob an ongoing Mah Jongg game, where they stole between $8,000 and $9,000 in cash as well as items of jewelry. Presentence Report ¶ 33. During the robbery, two of the occupants of the house were sexually assaulted. *Id.* Joseph played no role in those assaults. Transcript of Sentencing

Hon. Dora L. Irizarry
Page 4

Proceedings at 99:22-100:7, *United States v. Joseph Wang*, 90-cr-1019, Dkt. 106 (E.D.N.Y. Oct. 2, 1992).[1]

### D. Joseph Wang's Trial and Initial Sentence

Joseph was arrested in late 1990, and was subsequently indicted on eight counts stemming from his criminal activities as part of the Green Dragons. Joseph went to trial alongside seven other members of the Green Dragons. On April 4, 1992, after a nine-week jury trial, Joseph was convicted of all eight charged counts. Presentence Report ¶ 1. Joseph was sentenced to a mandatory term of life imprisonment.[2]

## II. JOSEPH WANG'S LIFE IN PRISON

### A. Near-Perfect Disciplinary Record

With no reason to believe he would ever be released, soon after his sentencing Joseph began to focus on rehabilitating himself, making amends for his destructive conduct, and growing as a person. Except for a single incident that occurred in 1991 before his trial,[3] Joseph has not had any disciplinary action in his 26 years of incarceration. In the words of the U.S. Probation Department, Joseph has been "a model prisoner," *see* U.S. Probation Revised Sentence Recommendation at 2—a testament to Joseph's actualized "capacity for change," which the Supreme Court emphasized in holding mandatory life sentences unconstitutional for juveniles in *Miller*, 132 S. Ct. at 2460 (quoting *Graham v. Florida*, 560 U.S. 48, 74 (2010)).

---

[1] In addition to these crimes, Joseph's ultimate RICO conviction was also based on a conspiracy to rob a restaurant in August and September of 1990 (the robbery did not ultimately occur), as well as a conspiracy to extort money from another restaurant between January and November 1990. *See* Presentence Report ¶¶ 6–7. He was also convicted of a November 1990 conspiracy to assault members of a rival gang. *Id*. ¶ 9.

[2] Specifically, he was sentenced to a life term on Counts 1, 2, 6, and 7; 20 years on Counts 27 and 28; ten years on Count 5; and three years on Count 17. All of these sentences ran concurrently with his sentence on Count 1. Second Addendum to the Presentence Report (PSR) at 2. Counts 1, 2, 6, and 7 are before this Court for resentencing. Count 1 was a charge of racketeering in violation of 18 U.S.C. § 1962(c). Count 2 was a charge of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Counts 6 and 7 were charges of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). Presentence Report at 1.

[3] Prior to his trial, in March of 1991, Joseph received a citation for possessing an unauthorized item, lying, and giving/accepting money without authorization. He was sanctioned with a loss of visitation privileges for 21 days. Second Addendum to the PSR at 6.

4

Hon. Dora L. Irizarry
Page 5

### B. Self-Improvement: Education, Work, Art, and Religion

Joseph has also taken advantage of every available opportunity to improve himself and his community during his incarceration.

#### 1. Education

From the outset of his imprisonment, Joseph began to take his education seriously, including working on his English and Chinese reading and writing skills. Ex. D. Over time, he completed courses in custodial maintenance, business, banking, knitting, painting, and drawing. Ex. G (2016 Inmate Skills Development Plan); Second Addendum to the PSR at 6. He has earned at least ten certificates for the completion of educational and vocational programs while incarcerated. *See* Ex. H (Joseph Wang's Prison Certificates). Perhaps most significantly, in 2007, Joseph completed his GED. Ex. G; Second Addendum to the PSR at 7.

#### 2. Work

Joseph has also maintained a consistent work history throughout his incarceration, most notably as a unit orderly and head unit orderly for eight years, collectively, at USP Allenwood, and as a tutor for the vocational training program at FCI Berlin. Ex. G; Second Addendum to the PSR at 5. Joseph's supervisors have consistently evaluated his work as "outstanding." Ex. G; Second Addendum to the PSR at 7.

#### 3. Artwork

During his incarceration, Joseph found a passion for painting, an activity he described as a "sanctuary." Ex. B at 8; *see also* Ex. I (Paintings by Joseph Wang). He has taken classes in the arts and instructed other inmates on art. *See* Ex. H. His work was featured in a local newspaper in 1994. Ex. J (Leavenworth Times article). He has sent his family members and friends numerous paintings over his twenty-six years in prison. Ex. E; Ex. F (Letter of Kathleen Panno). Joseph has also donated his work to local schools and public displays. *See* Ex. H; *see also* Second Addendum to the PSR at 7.

#### 4. Religion

Joseph connected with his family's Buddhist faith while in prison. Ex. E. As part of his dedication to Buddhism, he became a vegetarian and started fasting twice a month. *Id.*; Ex. D. He has been a practicing Buddhist for approximately nine years, and practicing Buddhism has helped Joseph find peace with himself while incarcerated. Ex. B at 8. Joseph also helped to create a Buddhism program in prison in order to share the peace that his religion brings to him with other inmates. *Id.*; Second Addendum to the PSR at 6.


### C. Connections and Contributions to Community

Joseph's personal growth in prison has enabled him to assist other individuals, including his family members, other inmates, and those less fortunate living outside of prison, in confronting challenges in their own lives.

#### 1. Family

Throughout his incarceration, Joseph has stayed in close touch with his family. Before his father's death in 1998, Joseph sent him letters and greeting cards regularly. Ex. D. Joseph talks regularly with his brother, William, as well as William's wife and daughters, and he calls them for every holiday and each of their birthdays. Ex. E. Joseph also speaks with his sister, Kristy, two or three times per week. Ex. B at 9. He sends homemade gifts, including wallets and blankets, to his nieces. Ex. E. Both of Joseph's siblings have watched Joseph grow into a more mature and caring person over his 26-year incarceration. Both siblings commented that despite his incarceration, Joseph frequently helps them in their lives. Ex. B at 9.

#### 2. Prison Community

Joseph has also focused on contributing positively to his community. Not only has he taught courses in painting and ceramics, but he has also offered instruction in health and nutrition. *See* Ex. H. As noted above, he helped to create a Buddhism program for other inmates with the help of the prison Chaplain, and he also helped the religious services department distribute greeting cards. Second Addendum to the PSR at 6; Ex. B at 8. Seeing others find guidance and support from Buddhism has brought Joseph happiness. Ex. B at 8.

Joseph played a particularly important role in the life of one of his cellmates, Philip Thibault. Mr. Thibault's mother, Kathleen Panno, has expressed how meaningful Joseph's presence in Mr. Thibault's life was during his incarceration, writing that "[i]t gave this mother great peace in an area where most would have not had such a wonderful influence on their child's life." Ex. F.

#### 3. Outside Community

Joseph has also sought opportunities to help the less fortunate outside the prison walls. He volunteered for and participated in the Vials/Bottles for Hope program, in which inmates paint medicine bottles to donate to cancer patients. Second Addendum to the PSR at 7; *see* Ex. H. Joseph also started the Knitting for Children's Hospitals program: At FCI Ray Brook, Joseph learned to crochet, and, to share that skill, Joseph developed a volunteer program for inmates to knit and crochet items for children with cancer. Ex. B at 8; Second Addendum to the PSR at 7; *see* Ex. H. Joseph found the ability to use his skills to help others "extremely fulfilling." Ex. B at 8.

### D. Remorse

While he has focused on education, painting, religion, and community service, Joseph has never lost sight of the gravity of his crimes. Joseph understands how wrong his actions were and feels sincere remorse for the pain he has caused and cannot reverse. Ex. B at 8. In his letter to this Court, he writes:

> All these years I have attempted to search for words to apologize for my actions, the lives I helped destroy, for all the un-erasable pain and anguish I have caused to all of the victim's family, and most of all the victims Mr. Mon Hsuing Ting, and Mr. Anthony Gallivan. As I was locked away in prison confinement, I have realized that no amount of time, nor my apologies would ever fully heal the wounds I had helped inflicted. . . . Your Honor, I would like to offer my sincere apologies to the families whom I have inflicted so much suffering upon.

Ex. A (Letter of Joseph Wang). Although he knows he cannot undo the suffering he caused to the family members of the victims, Joseph has tried to make a positive difference in the ways he can by working to better himself and dedicating his time to volunteer work and other good causes. Ex. B at 8.

## III. PROCEDURAL BACKGROUND

### A. Joseph Wang's Habeas Corpus Petition

At the time of Joseph's initial hearing, his life sentence was mandatory. *See United States v. Booker*, 543 U.S. 220, 233–34 (2005). In 2012, however, the Supreme Court announced its decision in *Miller v. Alabama*, which held that the Eighth Amendment prohibited the imposition of mandatory life sentences without the possibility of parole on juvenile offenders. 132 S. Ct. at 2460. Such sentences are unconstitutional, *Miller* held, because they "prevent[] those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,'" running "afoul" of the Court's individualized sentencing requirement "for defendants facing the most serious penalties." *Id.* (quoting *Graham*, 560 U.S. at 74); *see also id.* at 2463–64. Following *Miller*, Joseph filed a petition for a writ of habeas corpus seeking the retroactive application of *Miller* to his case. The Supreme Court subsequently held in *Montgomery* that *Miller* applied retroactively. *Montgomery*, 136 S. Ct. at 736. On August 29, 2016, this Court granted Joseph's habeas petition and vacated his sentence. *Wang v. United States*, 13-cv-03524-DLI, Order dated August 29, 2016.

### B. Resentencing of Joseph Wang's Co-Defendants

Two of Joseph's co-defendants—Alex Wong and Roger Kwok—were juvenile offenders who had been sentenced to a mandatory life sentence. Like Joseph, both were therefore entitled

7

to a new sentencing under *Miller*. Upon resentencing, Mr. Wong received 35 years in prison; Mr. Kwok received 37 years in prison.

Mr. Wong was resentenced by Hon. Raymond J. Dearie. In that proceeding, Mr. Wong requested 30 years in prison, focusing on his youth at the time of his criminal conduct and his subsequent maturation. The government requested that Mr. Wong instead be resentenced to life in prison. Among other things, the government asserted in justifying its sentencing request that Mr. Wong had attempted to kill a key witness before his trial so that she could not testify against him, Transcript of Resentencing Proceedings at 8:3–11, *United States v. Alex Wong*, 90-cr-1019-RJD-9, Dkt. 450 (E.D.N.Y. Apr. 8, 2016) ("Wong Resentencing Transcript"), and pointed to Mr. Wong's 28 separate disciplinary violations while incarcerated, which included possession of weapons and assault of both prison employees and fellow inmates, *id.* at 9:16–10:11. In highlighting this history, the government contrasted Mr. Wong's violent prison history with Joseph's record. *Id.* at 11:11–18 (noting "an important contrast" with Joseph, who had "one disciplinary incident in his 25 years in custody," and calling it "a significant difference" that "could potentially reflect the transient immaturity of youth versus somebody who continued to engage in violent conduct for many, many years after he turned 18"). As noted, Judge Dearie imposed a 35-year sentence. *Id.* at 22:14–24.

Mr. Kwok was resentenced before Hon. Sterling Johnson, Jr. In that proceeding, Mr. Kwok requested a sentence of 27 to 30 years in prison, noting his efforts at rehabilitation. The government requested 35 years. In doing so, it acknowledged that Mr. Kwok's disciplinary record was "nowhere near the violent record that Alex Wong had," but nevertheless noted that Mr. Kwok's record—which included 20 disciplinary violations stemming from his heroin use and two instances of possession of weapons—was "not a pretty picture," thus justifying its sentencing request. Transcript of Resentencing Proceedings at 11:21–12:25, *United States v. Roger Kwok*, 90-cr-1019-SJ, Dkt. 438 (E.D.N.Y. June 9, 2016) ("Kwok Resentencing Transcript"). As noted, Judge Johnson imposed a 37-year sentence. *Id.* at 17:9–13.

IV. APPLICABLE LEGAL STANDARD

Following *Miller* and *Montgomery*, a sentencing court must make an individualized assessment of the unique attributes of a youthful offender in determining the appropriate sentence. *Montgomery*, 136 S. Ct. at 735 (citing *Miller*, 132 S. Ct. at 2460). This assessment is guided by the "mitigating qualities of youth," *Miller*, 132 S. Ct. at 2467 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)), and its "hallmark features" of "immaturity, impetuosity, and failure to appreciate risks and consequences," *id.* at 2468. In other words, a court must consider a juvenile offender's "diminished culpability and greater prospects for reform." *Id.* at 2464.

Hon. Dora L. Irizarry
Page 9

### A.   Eighth Amendment Principles

*Miller* and *Montgomery* identified "three significant gaps between juveniles and adults" that account for the "diminished culpability and greater prospects for reform" of juvenile offenders. *Miller*, 132 S. Ct. at 2464. <u>First</u>, the Court explained, juveniles demonstrate a lack of maturity that leads to "recklessness, impulsivity, and heedless risk-taking." *Id.* (citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). <u>Second</u>, juveniles are more "vulnerable to negative influences and outside pressures" and lack the "ability to extricate themselves from horrific, crime-producing settings." *Id.* (citation and internal quotation marks omitted). <u>Third</u>, juveniles generally have characters and traits that are less "well formed" and "less fixed" than an adult's, making juvenile criminal conduct "less likely to be evidence of irretrievable depravity." *Id.* (citing *Roper*, 543 U.S. at 570) (citation and internal quotation marks omitted).

These significant gaps dramatically weaken the "penological justifications" for imposing the harshest sentences on juvenile offenders. *Id.* at 2465.[4] As described in *Montgomery*, "*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 132 S. Ct. at 2465). As a result, a sentencing court must assess the four key goals of punishment in light of the special characteristics of youth. As described by the Supreme Court:

- With respect to the penological goal of <u>rehabilitation</u>, because a life sentence without the possibility of parole "forswears altogether the rehabilitative ideal," the rationale is particularly "at odds with a child's capacity for change." *Miller*, 132 S. Ct. at 2465 (quoting *Graham*, 130 S. Ct. at 2030).

- With respect to <u>incapacitation</u>, that rationale is less likely to justify a longer sentence because it presupposes that the offender "is incorrigible," a trait that is "inconsistent with youth." *Id.* (quoting *Graham*, 130 S. Ct. at 2029).

- With respect to <u>deterrence</u>, the unique characteristics of juveniles—"their immaturity, recklessness, and impetuosity"—make them "less likely to consider potential punishment" in choosing their actions. *Id.* (quoting *Graham*, 130 S. Ct. at 2028).

---

[4] Upon consideration of the three factors enumerated above, "appropriate occasions for sentencing juveniles to this harshest possible penalty"—life imprisonment without the possibility of parole—"will be uncommon." *Miller*, 132 S. Ct. at 2469.

- With respect to <u>retribution</u>, the lesser culpability of juveniles weakens the case for retribution against them as compared to adults, because the retribution rationale "relates to an offender's blameworthiness." *Id.*

In sum, when sentencing a juvenile offender, a court must consider (1) the juvenile's diminished culpability at the time of committing a crime, and (2) the juvenile's heightened capacity for change thereafter. These factors inform the court's assessment of "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and thus guide the determination of what sentence is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, *id.* § 3553(a).[5]

### B. General Resentencing Considerations

*Miller* and *Montgomery* dictate the principles that guide the Court's assessment of the appropriate sentence for Joseph, as a juvenile offender, and, in conducting that assessment, the Court should consider his post-conviction incarceration history. As the Supreme Court has explained, when conducting a resentencing, a court should generally consider a defendant's post-conviction incarceration history in assessing the appropriate sentence under 18 U.S.C. § 3553. *See Pepper v. United States*, 562 U.S. 476, 491 (2011). Such evidence bears on "the history and characteristics of the defendant," and "the need for the sentence imposed" to serve the general purposes of sentencing—especially the purposes of deterring criminal conduct, protecting the public, and providing the offender "with needed educational or vocational training . . . or other correctional treatment in the most effective manner." *Id.* (quoting 18 U.S.C. § 3553(a)(1)–(2)). With respect to the resentencing of juvenile offenders under *Miller*, post-sentencing rehabilitation is particularly significant. As the *Montgomery* Court explained, a juvenile offender's conduct following his conviction is relevant to the determination of whether his crimes reflected his immaturity rather than a "permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734, 736.

---

[5] The Sentencing Guidelines are not the correct benchmark here. To begin, the Guidelines have not been revised since the Court handed down *Miller* and *Montgomery*, and thus do not include "'youth and its attendant characteristics' . . . as sentencing factors," contrary to the Court's directive in *Montgomery*, 136 S. Ct. at 735; *Miller*, 132 S. Ct. at 2460. *See* Note, *Mending the Federal Sentencing Guidelines Approach to Consideration of Juvenile Status*, 130 Harv. L. Rev. 994, 1003–08 (2017). In fact, the Guidelines expressly do *not* consider age as a relevant sentencing factor. *See* U.S. Sentencing Guidelines Manual § 5H1.1 (1991). In any event, even in an ordinary sentencing, the guidelines are considered as part of an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). In the case of a juvenile offender, the relevant considerations are those under the Eighth Amendment articulated in *Miller* and *Montgomery*.

Hon. Dora L. Irizarry
Page 11

## V. RELEVANT SCIENTIFIC EVIDENCE

As the Supreme Court noted in *Miller*, science and social science have established that there are "fundamental differences between juvenile and adult minds" that "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." 132 S. Ct. at 2464–65 (internal quotation marks omitted). These now well-established scientific principles regarding juvenile development have two key implications for courts considering an appropriate sentence for a juvenile offender: They both lessen "a child's moral culpability" and also enhance "the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Id.* (citation and internal quotation marks omitted).[6]

In the course of this resentencing proceeding, two leading experts in the field of adolescent psychology examined Joseph's case and both concluded that Joseph exemplifies these central scientific truths underlying *Miller*. Dr. Laurence Steinberg, one of the country's leading developmental psychologists,[7] examined Joseph's personal history and his record during his incarceration. Based on that review, Dr. Steinberg concluded that "the findings of scientific studies of adolescent psychological and brain development"—most notably, the "inherently weaker ability of adolescents to regulate impulsive behavior, foresee the likely consequences of their actions, appropriately attend to the potentially harmful consequences of a risky decision, and resist external influences to engage in undesirable behavior"—apply to Joseph's "behavior and psychological functioning at the time of the offense." Ex. C (Report of Dr. Laurence Steinberg) ¶¶ 27, 29. Dr. Steinberg further opined that, given scientific evidence that "approximately ninety percent of serious juvenile offenders age out of crime and do not continue criminal behavior into adulthood," *id*. ¶ 24,[8] Joseph's "exemplary behavioral record" during his incarceration indicates that he "has matured considerably since the offence and strongly suggests that he is unlikely to become involved in further criminal activity," *id* ¶ 27.

Similarly, Dr. Richard G. Dudley, Jr., a forensic psychiatrist with extensive experience in the field of juvenile development, conducted a psychiatric evaluation of Joseph and concluded that Joseph's crimes were not demonstrative of a failure of moral development, but were instead the result of psychological immaturity at the time they were committed. Like Dr. Steinberg, Dr. Dudley concluded that Joseph's behavior was consistent with scientific findings regarding the differences between the adolescent and adult brain. Ex. B at 11–12. Dr. Dudley also found that a

---

[6] *See generally* Ex. K (Amicus Brief in Support of the Resentencing of Petitioner Angel Alejandro, *United States v. Alejandro*, 98-cr-290-06 (CM) (S.D.N.Y. Apr. 430 2014) (appendix of sources omitted)).

[7] Dr. Steinberg's work (as well as an amicus brief he assisted in preparing) were cited in *Miller* as authorities on adolescent development. *See Miller*, 132 S. Ct. at 2464 & n.5.

[8] *See also* Ex. K at 22–23 ("Dozens of longitudinal studies show that only a small minority of juvenile offenders become adult criminals.").

series of traumatic personal events in Joseph's life exacerbated these developmental challenges. In particular, Dr. Dudley noted that Joseph's development was impacted by:

- His separation from his family—and, in particular, his mother—when the rest of his family moved from Taiwan to the United States when he was nine years old. *Id*. at 10.

- His inability to speak English upon arriving in the United States, and the failure of his school to provide him with the assistance necessary to learn English despite continuously promoting him to higher grades. The fact that Joseph took years to master even basic knowledge of English made school difficult for him and hampered his ability to make friends, leaving him socially isolated. *Id*.

- Most significantly, the illness and eventual death of his mother from cancer when Joseph was twelve years old. The impact of this traumatic event on Joseph's development was exacerbated by the fact that Joseph had nobody to support him during the year of his mother's illness or after her death. As Dr. Dudley concluded, "given Mr. Wang's age at the time, and in the absence of any assistance, it was difficult for him to experience his mother's death as anything other than an abandonment of him." *Id*. at 10–11.

Because of these events, Joseph entered adolescence with significant "developmental . . . and other psychiatric difficulties." *Id*. at 11. The death of Joseph's mother left him "in considerable emotional distress" and caused "his ability to function" to become "quite impaired." *Id*. Moreover, Joseph's inability to speak English and the lack of support at home left him "socially isolated" and deprived of "the life experience and knowledge base needed to do the psychological and social work of adolescence." *Id*. These difficulties together left Joseph "extremely vulnerable to being pulled into things that he didn't fully understand." *Id*.

These challenges interfered with the ongoing physical maturation of Joseph's brain. As Dr. Dudley noted, "when adolescents are suffering from other developmental and/or psychiatric difficulties, such difficulties also interfere with and slow down their development of the capacity for reasoned adult decision-making, despite the physical maturation of the brain. This was certainly the case with [Joseph]." *Id*. at 12. This left Joseph "particularly vulnerable to the type of recruitment efforts utilized by the Green Dragons," which preyed upon his "need to find a place to belong following his mother's death; his unstable sense of himself and need to feel good about himself; and his need for emotional support." *Id*.

According to Dr. Dudley, Joseph's mental status and development are completely different today. Joseph has caught up developmentally, he has "deeply reflected" on his new understanding of his early childhood events, he "has a stable and positive sense of himself," and he is "able to

regulate his mood, even when faced with distressing experiences." *Id*. Perhaps most significantly, Dr. Dudley found that it was "evident" that Joseph "has become able to reach out and help others, instead of only focusing on his own survival." *Id*. at 13. As Dr. Dudley concluded, in his professional opinion, Joseph is not only "no longer a risk to society," but "he is capable of being a productive citizen, a support to his family, and an aid to and hope for others in our society who need aid and hope." *Id*.

## VI. SENTENCING REQUEST

Joseph exemplifies the central teachings of *Miller* and *Montgomery*. Not only is he clearly among "the vast majority of juvenile offenders" for whom life sentences without parole are constitutionally impermissible, *Montgomery*, 136 S. Ct. at 734, but he also demonstrates how juveniles are meaningfully less mature than adults when they commit their crimes, and how they have a significant capacity to change their behavior. Given his age at the time of his criminal conduct, his personal history prior to his crimes, and his visible growth and rehabilitation during his time in prison, we respectfully submit that a sentence of 30 years' imprisonment would be sufficient but not greater than necessary to meet the sentencing factors set forth in 18 U.S.C. § 3553, when considered in light of *Miller* and *Montgomery*.

### A. Joseph Wang's Lack of Maturity At the Time of His Crimes

Under *Miller*, the Court must consider Joseph's "immaturity, recklessness, and impetuosity" at the time of his crimes, as well as his vulnerability to "negative influences and outside pressures," and his diminished ability to "extricate [himself] from horrific, crime-producing settings." *Miller*, 132 S. Ct. at 2464–65 (citing *Roper*, 543 U.S. at 569). Joseph's early life and crimes displayed these hallmarks of diminished maturity.

As a young child, Joseph was separated from his family and later brought to live and go to school in a country where he did not speak the language. At the age of 10, his mother became sick with cancer and Joseph witnessed her deterioration as he and his siblings cared for her. Ex. B at 4–6. Ultimately, when she passed away, Joseph turned to outside negative influences—older boys who spoke his language and whom he looked up to. *Id.* at 6. Joining the Green Dragons, and participating in the heinous crimes that he committed as a member, were horrible decisions that Joseph regrets. Ex. A.

The experts who have reviewed Joseph's history have concluded that his conduct reflects juvenile immaturity, including an inability to cope adequately with the death of his mother. In his psychiatric evaluation of Joseph, Dr. Dudley concluded that Joseph's age, the trauma of his separation from his family, and the death of his mother left Joseph in "considerable emotional distress"—distress that slowed the development of Joseph's decision-making skills even beyond that of a typical adolescent. Ex. B at 11–12. Similarly, Dr. Steinberg concluded that Joseph's crimes reflect precisely the immaturity characteristic of adolescents at that age. Ex. C ¶ 27; *see*

*Miller*, 132 S. Ct. at 2464. Dr. Dudley found that at the time of his recruitment and crime, Joseph simply had not yet developed the capacity for reasoned adult decision-making. Ex. B at 12.

These experts also concluded that Joseph exhibited youth's characteristic vulnerability "to negative influences and outside pressures." *Miller*, 132 S. Ct. at 2464 (quoting *Roper*, 543 U.S. at 569). Joseph's childhood was defined by instability. After being separated from his family at a young age only to be united with them in a foreign country whose language he did not speak, Joseph's mother became terminally ill. Ex. B at 4–6. Joseph lacked any emotional support during this time, and according to Dr. Dudley, "it was difficult for [Joseph] to experience his mother's death as anything other than an abandonment of him." *Id.* at 11. As a 12-year-old, he was unable to understand and cope with what was happening, which adversely affected his emotional and psychiatric development. *Id.* Joseph's history of instability and his delayed emotional development resulted in attachment issues, an intense need for belonging, an unstable sense of self, and a need for emotional support. *Id.* at 12. Consequently, he sought community among the Green Dragons and was "particularly vulnerable" to their negative influence. *Id.*; *see Miller*, 132 S. Ct. at 2464.

The hallmarks of Joseph's youth—his unstable, emotionally fraught home life and his ability to be influenced by the promise of finally belonging to a network of peers in the Green Dragons—do not diminish the severity of the crimes Joseph committed. Joseph's crimes were unquestionably serious and deserving of serious punishment. But given his troubled adolescence, impeded development, and vulnerability to negative influences, Joseph's criminal conduct must be viewed in light of his youth and immaturity and does not reflect the "irretrievable depravity" that would justify a longer sentence. *Cf. Miller*, 132 S. Ct. at 2464.

### B. Joseph Wang's Growth and Development Since He Was a Juvenile

*Miller* and *Montgomery* require the Court to consider Joseph's "greater prospects for reform" in setting the appropriate sentence. *Montgomery*, 136 S. Ct. at 733; *Miller*, 132 S. Ct. at 2464. Here, Joseph's character was not "well formed" at the time of his crimes and his actions were not "evidence of irretrievable depravity." *Miller*, 132 S. Ct. at 2464 (citation and internal quotation marks omitted). Instead, as the record of Joseph's personal development in prison demonstrates, he has changed meaningfully since he was a juvenile, and that change must guide the Court's sentencing determination. *See Montgomery*, 136 S. Ct. at 736.

Citing the record of his 26 years in the federal correctional system, the U.S. Probation Department found that Joseph has been "a model prisoner." U.S. Probation Revised Sentence Recommendation at 2.[9] Since he was originally sentenced in 1992, Joseph has not had a single disciplinary violation. Second Addendum to the PSR at 6. His history of self-improvement and commitment to others while incarcerated complement this record and show a changed person.

---

[9] The Probation Department has recommended that Joseph receive a sentence of 35 years.

Joseph has earned his GED and continues to take educational courses in subjects as diverse as business, banking, knitting, and custodial maintenance. Ex. G. He has developed positive outlets for his emotions and for many years has been a devout Buddhist and passionate painter. Ex. B at 8. He has helped other inmates develop similar interests by teaching painting and ceramics courses and assisting in the creation of a Buddhism program. *Id.*; *see* Ex. H. As evidence of his maturity, Joseph has held positions of leadership within the prison work structures: He has served both as a head unit orderly and as a tutor for the vocational department. Ex. G; Second Addendum to the PSR at 5. Joseph's work is routinely evaluated as "outstanding." Ex. G; Second Addendum to the PSR at 7.

Joseph's nearly spotless disciplinary record over the past 26 years and his growth while incarcerated clearly demonstrate that Joseph has been rehabilitated. His record during his imprisonment reveals his maturation from a troubled and reckless 16-year-old to a model member of his community who has outgrown the "transient immaturity" of youth. *Montgomery*, 136 S. Ct. at 735. Critically, moreover, Joseph has reflected on his crimes and has genuine remorse for his actions as a teenager. In his words: "[N]o amount of time, nor my apologies would ever fully heal the wounds I had helped inflicted. . . . Your Honor, I would like to offer my sincere apologies to the families whom I have inflicted so much suffering upon." Ex. A.

In short, Joseph's history demonstrates "the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S. Ct. at 736. Given his record in prison, Joseph's record makes clear that, upon release, he will be a productive and contributing member of his community.[10]

### C. Comparison to Joseph Wang's Co-Defendants

A 30-year sentence is appropriate in comparison to the revised sentences his co-defendants received, given the stark difference between Joseph's prison record and his co-defendants' extensive disciplinary records. *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (acknowledging consideration of "similarities and differences among co-defendants" in fashioning a sentence). As noted above, Mr. Kwok had 20 disciplinary violations during his incarceration, stemming from his heroin use and two instances of possession of weapons. *See* Kwok Resentencing Transcript at 11:21–12:25. The government contrasted Mr. Kwok's disciplinary record with Mr. Wong's more serious history of violence in prison. For Mr. Wong's part, he had 28 disciplinary violations, including possession of weapons and assault of both prison employees and fellow inmates. *See* Wong Resentencing Transcript at 9:16–10:11. During Mr. Wong's resentencing, the government emphasized the "significant difference" between Mr. Wong's

---

[10] It is counsel's understanding that Joseph is subject to an immigration detainer and that he may therefore be placed into removal proceedings should he be released. Joseph's sister, Kristy, has arranged housing for Joseph in the event that he returns to Taiwan. Second Addendum to the PSR at 4. Both of Joseph's siblings have offered to house and help Joseph should he remain in the United States. *Id.*

lengthy disciplinary history and Joseph's nearly unblemished record. *Id.* at 11:10–18. Mr. Wong was ultimately sentenced to 35 years, and Mr. Kwok was sentenced to 37 years.

Sentencing Joseph to 30 years would recognize that Joseph's extensive rehabilitation in prison far more closely aligns with *Miller*'s principles than that of Messrs. Kwok and Wong, and would thus serve the interests of horizontal equity in sentencing.

\* \* \*

For the foregoing reasons, we request that the Court impose a sentence of 30 years' imprisonment. We look forward to addressing these issues further at the sentencing proceeding set by the Court.

Respectfully submitted,

*/s/ Michael W. Ross*

Michael W. Ross

cc: Douglas M. Pravda
United States Attorney's Office for the Eastern District of New York

Joseph Wang
Inmate No. 30026-053
Metropolitan Detention Center

Helen Georgopoulos
United States Probation Office